In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4160

United States of America,

Plaintiff-Appellee,

v.

Enrique Rivera,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:98-000017-001--Richard L. Young, Judge.

Argued October 22, 2001--Decided December 10, 2001


  Before Flaum, Chief Judge, and Ripple and
Williams, Circuit Judges.

  Flaum, Chief Judge.  A jury found Enrique
Rivera guilty of conspiring to possess
with the intent to distribute cocaine in
violation of 21 U.S.C. sec.sec. 841(a)(1)
and 846, and conspiring to conduct
financial transactions from proceeds of
an unlawful activity in violation of 18
U.S.C. sec.1956(a)(1) (A)(i). The
district court imposed a 293-month
sentence for the narcotics conspiracy
count, and a 240-month sentence for the
money laundering count, to run
concurrently with each other and with a
prison sentence imposed in California in
1999. Rivera now contends that the
evidence at trial was insufficient to
support the jury's verdict that he was a
member of a narcotics trafficking
conspiracy. We agree, and reverse his
conviction on that charge.

I.  Background

  Rivera supplied cocaine to Derrick
Hardin four times between April and July,
1996. The transactions began when Hardin,
who had been purchasing cocaine in
Georgia and Florida, called his friend
George Tyson in April of 1996 and asked
the going rate of cocaine in California.
Tyson, who acted as a middleman in the
transactions between Rivera and Hardin,
informed Hardin that he could buy the

drug at a lower price in California than he had been paying in the southeast. Hardin then flew to California to buy a kilogram of cocaine.

# a.  Transaction One AApril, 1996

After speaking to Tyson, Hardin flew to Los Angeles, California, carrying over $16,000 in cash to purchase cocaine. Tyson and Rickey Franklin, another middleman, met him at the airport and drove with him to Franklin's home where Rivera met them to discuss the sale. The next day, Tyson, Franklin, and Hardin went to Rivera's house and Hardin gave Rivera $15,500--the price Rivera quoted for one kilogram of cocaine. After giving Rivera the money, Hardin asked Rivera whether he could buy more cocaine at an even lower price in the future. Rivera responded that, although he might be able to procure the narcotic at a lower price, he could not give a specific quote at that time. Hardin, Franklin, and Tyson immediately went to another location to pick up the drugs, as instructed by Rivera. Hardin paid Tyson $800 and Franklin $400 for setting up the deal, flew back to Indiana with the one kilogram of cocaine, and later sold it to a buyer for $23,500.

# ############b.  Transaction Two MMay, 1996

Hardin again asked Tyson to arrange a sale of one kilogram of cocaine. Hardin's brother, Charles, flew to California with $16,000 to complete the purchase. Tyson and Franklin told Charles that Rivera would be supplying the cocaine, and took Charles to Franklin's house where Rivera met them. After Rivera left the house, Charles gave Franklin $14,800 and Franklin gave Charles a kilogram of cocaine. Charles paid Tyson and Franklin, and flew back to Indiana where he told Hardin that he had purchased the cocaine from Rivera.

# c.  Transaction Three  June, 1996

Hardin telephoned Tyson a third time and asked whether it was possible to buy five kilograms of cocaine at a better price than the previous one-kilogram purchases. Tyson called back the next day and reported that it was. Hardin took $50,000 and flew to Los Angeles. Two couriers flew separately with an additional

$30,000. Hardin went with Franklin and Tyson to Franklin's house. The next day, Hardin went to Rivera's house and discussed the potential five-kilogram purchase. Rivera informed Hardin that cocaine prices had risen, and that the price per kilogram was $16,300. Hardin, unhappy that the price was higher than anticipated, purchased only three kilograms. It is unclear from the record whether he took possession of the three kilograms of cocaine while at Rivera's house or picked it up from another location. Rivera told Hardin that he would look around for a day or two and attempt to locate an additional two kilograms for a lower price. Hardin agreed, and asked Rivera to front him the two kilograms: that is, he asked Rivera to give him the cocaine without requesting immediate payment so he could then sell the drugs on consignment. Rivera refused to do so. Before Rivera contacted him about the additional cocaine but after Rivera had secured it, however, Hardin purchased two kilograms from another supplier. Rivera told Hardin that he was upset that Hardin had used another seller when he had told him that he likely would be able to obtain the cocaine. Hardin replied that he would buy from Rivera the next time if he could give him a favorable price. The two exchanged pager numbers, but made no specific future plans. Hardin paid Tyson and Franklin, and flew back to Indiana. The couriers flew back with the cocaine.

#d.  Transaction Four  July, 1996

  Two weeks after the third transaction, Rivera paged Hardin and told him that California cocaine prices were good. Hardin arranged for his brother, already in California, to purchase one kilogram from Rivera, and for a courier to fly from Indiana to bring Charles the money and to return with the drugs. The courier delivered the money to Charles who contacted Rivera. Rivera sent a third person to count the money. Charles and Franklin took the money to Rivera's house, and a man who was there at the time drove to Franklin's house immediately afterward with the cocaine. The courier returned to Indiana with the narcotics, and was arrested at the Evansville Regional Airport. Based on information she gave the police, Hardin was arrested later that day and Charles

was arrested the next day at the Evansville airport. Before he left California, Franklin (not Rivera) fronted Charles nine additional ounces of cocaine.

## II. Discussion

Rivera argues that his conspiracy conviction should be reversed based on two grounds. First, he contends, the evidence showing an agreement to possess with the intent to distribute cocaine was insufficient. Second, the district court gave the jury a misleading and false instruction regarding a drug dealer's participation in a conspiracy, violating his substantial rights.

## A. Insufficiency of Evidence

Being part of a buyer-seller agreement cannot alone sustain a conspiracy conviction because the sale has no separate criminal object. United States v. Torres-Ramirez, 213 F.3d 978, 981 (7th Cir. 2000). In order to establish that a narcotics dealer was part of a criminal conspiracy, the government must show an agreement to commit a further crime, usually involving the subsequent distribution of drugs by the buyer. United States v. Contreras, 249 F.3d 595 (7th Cir. 2001); Torres-Ramirez, 213 F.3d at 981; United States v. Lechuga, 994 F.2d 346, 349 (7th Cir. 1993) (en banc). "[W]e are looking for evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." Contreras, 249 F.3d at 599 (quoting United States v. Pearson, 113 F.3d 758, 761 (7th Cir. 1997)) (internal quotations omitted). Of course, the government may show such an agreement with circumstantial evidence. United States v. Pagan, 196 F.3d 884, 889 (7th Cir.), cert. denied, 530 U.S. 1283 (2000). Showing that the buyer purchased a quantity larger than could be used for personal consumption, however, is not enough to show conspiracy on behalf of the seller. Lechuga, 994 F.2d at 349. Nor is the seller's knowledge of the buyer's illegal activities or resale objectives enough. Torres-Ramirez, 213 F.3d at 982; Lechuga, 994 F.2d at 347-50.

To determine whether a conspiracy exists between a buyer and seller of illegal

narcotics, this Court has looked to the following factors: 1) length of relationship; 2) established method of payment (for example, fronting); 3) the extent to which the transactions were standardized; and 4) the level of mutual trust between buyer and seller. Contreras, 249 F.3d at 599. None of these factors is dispositive. Id. "'[I]f enough [of the factors] are present and point to a concrete, interlocking interest beyond individual buy-sell transactions we will not disturb the fact-finder's inference that at some point, the buyer-seller relationship developed into a cooperative venture.'" Id. (quoting United States v. Hach, 162 F.3d 937, 943 (7th Cir. 1998)).

Rivera sold cocaine to Hardin four times over a three-month period. This fact is uncontested and incontrovertible. Repeat sales, without more, simply do not place the participants' actions into the realm of conspiracy, however. Id. at 600. While we review the evidence in the light most favorable to the government and defer to the credibility determinations of the trier of fact, Jackson v. Virginia, 443 U.S. 307, 319 (1979), the government cannot show that Rivera conspired with Hardin or with anyone else. What it does show is a "series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise." Lechuga, 994 F.2d at 349. The evidence that the government presented is just too modest to support the conspiracy charge found by the district court. There is no evidence that Rivera fronted cocaine to Hardin. He expressly refused to do so. No other established method of payment existed that suggests Rivera's participation in a conspiracy. The argument that the government advances-- that Hardin sold the cocaine that he bought from Rivera and reinvested the profits into larger purchases from Rivera, therefore an established method of payment existed-- is unviable. If that were the case, every repeat seller would also have an established method of payment and two of the factors of conspiracy would be shown from the mere fact of repeated dealings. Factors one and two are distinct, however, and again, this Court has held that mere repeated dealing, on its own, does not establish a conspiracy. Contreras, 249 F.3d at 600. Furthermore, there is nothing to support the

contention that the transactions were standardized; they involved different people, different prices, different locations, and different methods of payment and delivery. The government did not show a high level of trust between Rivera and Hardin. While the evidence does show that Hardin placed a limited amount of trust in Rivera--he or his brother twice paid first and received delivery of the cocaine later in the day--"many a buyer in an ordinary commercial sale pays first and receives delivery later." Torrez-Ramirez, 213 F.3d at 982. Evidence of such a system does not suggest a level of trust that would allow the fact finder to infer a conspiracy. Furthermore, if it shows any trust at all, it is of the non-mutual variety. If anything, Rivera's requiring payment before delivery of the cocaine shows a lack of trust in Hardin, Tyson, Franklin, and the other charged co-conspirators.

In short, the evidence in this case shows none of the plus factors necessary to infer the evolution from a mere-buyer-seller arrangement to a conspiracy. To hold otherwise would directly contradict Contreras, a case decided this year which we are unwilling to revisit. The government argues that in that case, the seller did not offer the buyer a favorable price on future sales and that the prolonged cooperation shown here did not exist. Rivera merely invited Hardin to deal in the future. The government showed only that Rivera wanted Hardin's business--that is indicative of a buyer-seller relationship, not a conspiracy. Moreover, Rivera did not cooperate with Hardin in any way not present in the buyer-seller relationship in Contreras. There were multiple sales over a number of months in both cases (although even that evidence is not as strong in the present case: Rivera sold cocaine to Hardin four times over three months. Contreras sold cocaine to a buyer ten times over six to ten months). The cases are not distinguishable in any meaningful way.

The government convincingly showed that Rivera is guilty of distributing narcotics. Unfortunately, Rivera was not charged with drug distribution because that crime could not be prosecuted in Indiana; proper venue would have been in California only. Torres-Ramirez, 213 F.3d

at 981 (citing United States v. Rodriguez-Moreno, 526 U.S. 275 (1999)). A conspiracy conviction is not a simple substitute for a drug distribution conviction. No matter how overwhelmingly the government showed Rivera's participation in drug sales, it did not show his agreement to join in a further crime. Rivera's conspiracy conviction is therefore reversed. His money laundering conviction, of course, still stands.

## B. Improper Jury Instruction

Although our holding rests on the insufficiency of the evidence, we also agree with Rivera that the district court's jury instruction number 12 was misleading. The instruction read:

In order to find Enrique Rivera as part of a conspiracy, you need to find he made an agreement to join the conspiracy to distribute 5 or more kilograms of a substance of mixture containing a detectable amount of cocaine. An agreement can be inferred in several instances. For example, an agreement can be inferred when:

(1) a dealer "fronts" drugs to his customer because his payment depends on the success of the resale venture; or

(2) when a dealer participates in more than one sale; that is, the dealer participates in multiple sales.

As discussed above, this Court has held that none of the factors used to determine whether a conspiracy existedbetween a seller and buyer is sufficient, standing alone, to support a conspiracy conviction. The instruction told the jury that a conspiracy could be inferred either when a dealer fronts money or when he participates in multiple sales. Our case law says otherwise, as cited above. Also, this Court has held that "[d]istrict judges should inform juries that repeated transactions do not constitute a conspiracy." United States v. Gee, 226 F.3d 885, 895 (2000) (citing United States v. Thomas, 150 F.3d 743, 745 (7th Cir. 1998)). The court in the instant case informed the jury of the opposite. The instruction could likely have misled the jury into finding a conspiracy when the government did not supply facts to support the elements of

that crime.

We review the instruction for plain error. United States v. Mims, 92 F.3d 461, 465 (7th Cir. 1996). To find plain error, the instruction must have affected Rivera's substantial rights. Id. That is, we must determine that the error "substantially affects the fairness, integrity, or public reputation of judicial proceedings." Id. (citing United States v. Olano, 507 U.S. 725, 732-36 (1993)). Here, the district court's error had serious potential to affect the outcome of the case. Therefore, even if the evidence was adequate to support the conspiracy conviction, this instruction may have undermined the essential fairness and integrity of the trial, man dating reversal of the conspiracy conviction. Gee, 226 F.3d at 896 ("[W]here, as here, 'the existence of a conspiratorial agreement was closely contested and conflicting evidence was presented on the issue, the failure to ensure a jury finding on this essential element undermined the essential fairness and integrity of the trial.' "); Mims, 92 F.3d at 465-66.

However, because the evidence was not adequate, as shown above, we need not make such a finding.

III. Conclusion

Because the government failed to produce evidence showing that Rivera agreed "to commit some other crime beyond the crime constituted by the [sale] itself," Lechuga, 994 F.2d at 349, we REVERSE Rivera's conspiracy conviction and REMAND this case to the district court for resentencing.