In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-2195, 04-2196 & 04-2668

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REYES CARRILLO, PEDRO HERRERA,
and MARIA MIRANDA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 729—**David H. Coar**, *Judge.*

ARGUED JUNE 10, 2005—DECIDED JANUARY 27, 2006

Before FLAUM, *Chief Judge*, and POSNER and KANNE,
*Circuit Judges.*

KANNE, *Circuit Judge.* Reyes Carrillo, Pedro Herrera,
and Maria Miranda were charged in a seven-count indict-
ment relating to their involvement in a conspiracy to
distribute cocaine and heroin. The jury convicted Carrillo,
Herrera, and Miranda on six counts of the indictment.[1]
Carrillo was convicted of conspiracy, drug trafficking, and

---

[1] Count 7 charged Miranda and a fourth person, Luz Gomez, with
retaliating against a government witness. Miranda and Gomez
were acquitted of the charge in Count 7.

attempted possession with intent to distribute. Herrera was convicted of conspiracy and attempted possession with intent to distribute. Miranda was convicted of conspiracy and drug trafficking. These defendants now appeal their convictions raising several arguments. Carrillo argues that there was insufficient evidence to support his conviction for the charged drug trafficking conspiracy. Carrillo also argues that the district court abused its discretion in denying his motion for severance, especially where counsel for Herrera commented on the inability to cross-examine Carrillo. Herrera argues that there was insufficient evidence to support his convictions for conspiracy and attempted possession of cocaine with intent to distribute. Miranda argues that the district court improperly provided the jury with the so-called "ostrich instruction." Carrillo and Herrera also argue that their Sixth Amendment rights were violated during sentencing. For the following reasons, we affirm, but order a limited remand for a determination as to Carrillo's and Herrera's sentences pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. HISTORY

At trial, the government presented evidence that Carrillo, Herrera, Miranda, and others participated in a conspiracy to import multiple kilograms of heroin and cocaine from Mexico for distribution in the United States. A substantial portion of the government's evidence was the testimony of a confidential informant, Oscar Diaz.

### A. Background of the Conspiracy: Carrillo, Diaz, and Herrera

Around mid-2000, Diaz was introduced to Carrillo through a common contact in the drug-dealing business. Diaz told Carrillo that he was interested in making

money. Carrillo confirmed that Diaz had legal status in the United States and then offered Diaz an opportunity to transport cocaine across the United States-Mexico border in a car. Diaz accepted the offer. Carrillo was interested in Diaz's legal status because he thought it easier for Diaz to cross the border into the United States as a legal resident. Carrillo also thought it necessary for Diaz to be registered as the owner of the car containing the drugs that Diaz would drive across the border. Accordingly, Carrillo had Diaz register a Cadillac in Diaz's name. Both Carrillo and Diaz then drove to Mexico, with Diaz driving the Cadillac he had registered in his name, and Carrillo driving another car. Upon arrival in Mexico, Carrillo prepared the Cadillac for the return to Chicago by hiding drugs in the car's driveshaft. During this first trip to Mexico, Diaz was not involved in packing the car with drugs, but he was aware that the car contained cocaine, though he did not know precisely where. Diaz drove the car across the border and to East Chicago, Indiana, where Carrillo maintained a residence. Diaz returned the car to Carrillo, and Carrillo then paid Diaz more than $5,000.

After this first trip to Mexico, Diaz continued to work with Carrillo distributing drugs. Some time in 2001, Carrillo began instructing Diaz on Carrillo's method of packing drugs in a car's driveshaft. Carrillo wanted Diaz to learn this so that Diaz could pack cars in Mexico and unpack them in Chicago without Carrillo's presence being necessary.

Herrera frequently distributed Carrillo's drugs. As Diaz testified at trial, Carrillo trusted Herrera and would front drugs to him. Furthermore, Carrillo rented a home in Palatine, Illinois, where he stored drugs and conducted drug deals. The home's lease listed a "Cousin Pedro" as a contact for the real estate broker. Herrera, whose first name is Pedro, was the subscriber to the telephone number on the lease attributed to "Cousin Pedro." In one instance,

Herrera took cash from Carrillo to pay the rent for this home.

## B. *Miranda and the Black Cadillac*

Miranda found her way into the drug conspiracy when she became romantically involved with Diaz in 2001. As Diaz testified at trial, Miranda had witnessed some of Diaz's involvement in drug trafficking. Specifically, in late 2001 Miranda witnessed Diaz collecting money from Herrera and discussing the prices of drugs. She also was present when Diaz, on behalf of Carrillo, paid another person $1,500. When she became aware that Diaz had driven drugs in from Mexico, she told Diaz that she would like to "make a trip and make some money." Diaz informed Carrillo of Miranda's desire, and all three met to discuss Miranda making a trip to Mexico. According to Diaz, Carrillo told Miranda that she would drive a car packed with cocaine and that she could cross the border without difficulty in the same way that both Diaz and another individual had. Despite the fact that Carrillo told Miranda that she would be transporting cocaine, Diaz knew that she would actually be transporting heroin.

In preparation for her trip to Mexico, Miranda went with Carrillo to have a black Cadillac registered in her name. Carrillo then arranged for Miranda to fly to Odessa, Texas, on February 16, 2002. Carrillo met her at the airport in Odessa, and drove her across the Mexican border. Diaz traveled separately to Mexico where he met Miranda and Carrillo. The next day Carrillo and Diaz prepared the black Cadillac for Miranda by filling its driveshaft with heroin. Miranda was not present when this occurred. After the black Cadillac was ready, the day after she arrived in Mexico, Miranda and Diaz crossed the U.S.-Mexico border driving separate cars. Miranda and Diaz then stopped in Odessa, Texas, to pick up Jose Trejo, an associate of

Carrillo's. They continued on to Chicago, with Miranda driving alone and Diaz and Trejo driving together. Upon arriving in the Chicago area, Miranda was dropped off at her home in Cicero, Illinois, and Trejo drove the black Cadillac to Carrillo's home in East Chicago, Indiana, with Diaz following in his car. After meeting up with Carrillo, Diaz and Carrillo drove to Carrillo's home in Palatine, Illinois, where they removed the driveshaft from the black Cadillac and retrieved the heroin. Diaz later observed Carrillo pay Miranda $5,000, and he was told by Carrillo that Miranda had been given additional money.

## C.  The White Cadillac

Diaz made another trip to Mexico in March or April of 2002 to pick up more heroin. This trip was taken by Diaz, Carrillo, and another associate, Salvador Zamora. All three drove to Mexico together, and the plan was for Zamora to drive a car packed with heroin back into the United States. Carrillo, who perhaps preferred Cadillacs because of his familiarity with their driveshafts, had arranged for a white Cadillac to be present in Mexico. Carrillo told Diaz that he intended to register that white Cadillac under the name of Juan Jose Guajardo. Zamora was to pose as Juan Jose Guajardo. Diaz knew that Carrillo had also obtained a birth certificate and Social Security card in that name.

As before, heroin was placed in the driveshaft of this white Cadillac. Carrillo then fitted the white Cadillac with the license plates he had obtained for it. Carrillo had also brought the registration for the car which was in the name Juan Jose Guajardo, which he apparently gave to Zamora. Zamora then drove the white Cadillac across the border with Diaz following in a separate car. This time, however, things did not go so well. Instead of making it to Chicago, the white Cadillac broke down near Odessa.

After discussions with Carrillo, Diaz and Zamora left the white Cadillac in Odessa and returned to Chicago.

Shortly thereafter, in April of 2002, Diaz was contacted by law enforcement officers. These officers informed Diaz that they knew he was involved in illegal drug trafficking. After a series of discussions, Diaz agreed to cooperate with authorities. Diaz informed the government of his involvement with Carrillo and of the white Cadillac left in Odessa.

On May 8, 2002, DEA agents conducted surveillance on Carrillo's home in East Chicago for the purpose of observing Carrillo retain possession of the white Cadillac. On that day the agents saw Carrillo and a male Hispanic drive together to a restaurant's parking lot in Palatine. The agents watched as a flatbed tow truck with a white Cadillac on it entered the parking lot and headed toward Carrillo. Carrillo lifted his left arm as if to wave at the tow truck; then Carrillo drove out of the parking lot with the tow truck following in the same direction. The agents quickly pulled over the tow truck and seized the white Cadillac. An agent interviewed the driver of the tow truck and discovered that one of the phone numbers listed on the driver's cellular telephone was subscribed to by Miguel Vargas of Aurora, Illinois.

After seizing the white Cadillac on May 8, 2002, the agents took out its driveshaft and discovered heroin and cocaine. The agents ran the title history of the car and discovered that Carrillo had purchased it in February, 1999. The title history also showed that the white Cadillac had been sold to Juan Jose Guajardo and listed Guajardo's phone number. Diaz had used this number to reach Carrillo during the government's investigation.

About two months later, on July 2, 2002, agents covertly recorded a conversation between Carrillo and Diaz during which Carrillo discussed how a person named Miguel, along

with Trejo, had brought the white Cadillac from Odessa to Aurora and then hired a tow-truck driver to tow the white Cadillac from Aurora to Palatine. Carrillo also explained to Diaz how the authorities had pulled over the tow truck and seized the white Cadillac, and how Carrillo had "paid 120 bucks to be able to claim the title" for the white Cadillac. Consistent with that recorded statement, the title history of the white Cadillac showed that on May 21, 2002, Juan Jose Guajardo applied for a duplicate title. Furthermore, between the time the white Cadillac was seized on May 8, 2002, and July 12, 2002, an attorney claiming to represent Juan Jose Guajardo contacted the DEA to obtain the seized white Cadillac. It was stipulated at trial that this attorney had never met Juan Jose Guajardo and that Herrera was the individual who had come to the attorney's office requesting that the attorney look into the return of the white Cadillac.

### D.  The Attempt to Purchase Cocaine

In May of 2002, around the time that the white Cadillac was seized, Diaz made another trip to Mexico with the government's authorization. While in Mexico, Diaz met an individual and discussed with him the possible purchase of between 70 and 75 kilograms of cocaine. After returning from Mexico, Diaz informed Carrillo of this opportunity. On July 1, 2002, Carrillo told Diaz that Herrera had a customer who wanted to purchase 25 kilograms of the cocaine. On July 2, 2002, Carrillo and Diaz discussed doing a drug deal with Herrera's customer and decided to inform Herrera that money would need to be paid up front for this deal. Usually, Carrillo would front drugs to Herrera, but on this deal the individuals supplying the cocaine would want money immediately. On July 11, 2002, Carrillo, Herrera, and Diaz met to finalize the details of the deal. Portions of this meeting were recorded by the government. By this time,

Herrera's prospective customer had dropped out of the deal, but Herrera and Carrillo had decided to go in together to purchase the cocaine from Diaz's source. Diaz and Herrera discussed money, and Herrera said that he could come up with somewhere between $105,000 and $150,000. Carrillo and Herrera told Diaz to bring the drugs to the home in Palatine where the deal could be completed. Diaz understood that the drug deal would occur on the next day, July 12, 2002, at the home in Palatine. The meeting ended, and DEA agents saw a man, later identified as Herrera, enter a green Chevy Blazer and drive away.

On the following day, DEA agents set up surveillance around the home in Palatine. The agents observed the same green Chevy Blazer they had earlier attributed to Herrera parked in the driveway of the home, along with a four-door Oldsmobile. The agents' cover was quickly broken as one of them was spotted, which resulted in two individuals fleeing the home and driving off. The agents embarked on a high-speed chase of the Blazer as it weaved through traffic and eventually caught up with the Blazer, pulled it over, and learned that Herrera was the driver. A subsequent search of the Blazer uncovered a trap compartment containing $150,095. Both the Blazer and the money were seized. At that time, Herrera denied knowing of the trap or ownership of the money, but some time later, Herrera's attorney filed a notice on behalf of Herrera with the DEA asserting ownership of the Blazer and the seized cash. Herrera personally signed the claim.

While agents chased Herrera, another agent contacted the police department in East Chicago requesting that an officer look for an Oldsmobile believed to be driven by Carrillo. Early in the morning of July 13, 2002, officers discovered an Oldsmobile at Carrillo's home. As he got out of the car, Carrillo was arrested.

On September 26, 2002, agents executed a search warrant on the home in Palatine and noticed Herrera driving by the

home. During the search, agents entered the garage and discovered the black Cadillac Miranda had used to cross the U.S.-Mexico border. At that time, the car was still registered to Miranda, and its driveshaft was missing. Inside the car, agents found wrappings with cocaine residue and a scale box.

*E.  The Trial*

The trial began on July 15, 2003, and the case went to the jury on July 29, 2003. Prior to trial, Carrillo moved to sever from Herrera arguing that Herrera's defense would be antagonistic to his own. Judge Coar denied the motion. Herrera's defense at trial was to admit that he was a drug dealer and buyer, but to deny that he had any involvement in a conspiracy, and to deny that he attempted to purchase cocaine on July 12, 2002, as the government alleged. Carrillo's defense was that he had no involvement whatsoever with drugs.

Miranda's defense at trial was that she did not know the black Cadillac was stuffed with drugs when she drove it from Mexico into the United States in February of 2002. Miranda testified that she had agreed to travel to Mexico with Carrillo during February of 2002 to attend a party and to learn how to drive the route between Mexico and Chicago. Miranda had a daughter living in Mexico. She explained that she wanted to drive back from Mexico, instead of flying, because she wanted to learn to make the drive so that visiting her daughter in Mexico would be more convenient. She never actually attended a party in Mexico, and testified that she was angry with Diaz for that because she had felt misled. As for the fact that Carrillo paid for her plane ticket, and then gave her the black Cadillac registered in her name, Miranda testified that she considered these gifts, and was not suspicious because she assumed the gifts were motivated by what she believed to be his roman-

tic interest in her. Finally, Miranda testified that she sold the car to a friend of Carrillo's after discovering that it had mechanical problems. She did not transfer the registration to that person, which her attorney in closing argued was because Miranda was not the type of person to be concerned with such details.

At a jury instruction conference, the government requested that Judge Coar issue a "conscious avoidance" instruction or "ostrich instruction." Miranda objected to the instruction, and also requested that if the instruction were given, that it just be given generally, without any indication that it applied to any specific defendant. Judge Coar deferred ruling on the issue. During closing argument, the government again requested the instruction, and in support, argued to Judge Coar "that we . . . should be able to argue knowledge from when the defendants were placed in a position that a reasonable person would have asked questions, would have inquired about and they didn't inquire." Miranda objected, and argued that the decision to give an ostrich instruction is not based on a reasonable person standard. Judge Coar ruled in favor of the government, reasoning that Miranda's "trip to Mexico in February [of 2002] cries out for an ostrich instruction."

During closing, Herrera's attorney commented on the inability to cross-examine Carrillo. Herrera's attorney argued to the jury that it was Carrillo who had provided Herrera's name ("Cousin Pedro") and phone number on the lease for the home in Palatine. "And why he gave that information," Herrera's counsel explained, "I don't know because I can't cross-examine him." After a brief discussion with the attorneys, and at Carrillo's attorney's request, Judge Coar instructed the jury on the defendant's right to remain silent and the government's burden to prove each defendant guilty beyond a reasonable doubt. No further comment was made with respect to Carrillo's decision not to testify.

After the jury's verdicts, Carrillo, Herrera, and Miranda were sentenced to 372 months' imprisonment, 360 months' imprisonment, and 120 months' imprisonment, respectively.

## II.  ANALYSIS

### A.  *Sufficiency of the Evidence*

Both Carrillo and Herrera argue that the evidence at trial was insufficient to sustain their convictions. We have often pointed out the difficulty Carrillo and Herrera now face in arguing that the jury lacked sufficient evidence upon which to convict. *See, e.g., United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004) ("The standard of review facing the defendants on their claim that the jury had insufficient evidence to convict is a daunting one.") (citations omitted); *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001) ("In attacking the sufficiency of the evidence, a defendant bears a heavy burden.") (citations omitted). Mounting a challenge to the sufficiency of the evidence is so difficult because to be successful, the defendant must show that "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Viewing the evidence in the light most favorable to the prosecution means that on review we will not—despite defendants' frequent requests to do so—"weigh the evidence or second-guess the jury's credibility determinations." *Gardner*, 238 F.3d at 879. We will certainly not overturn a conviction because we would have voted to acquit; rather, "[w]e will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Curtis*, 324 F.3d at 505 (citing *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999)).

To prove a conspiracy, the government had to show that "(1) two or more people agreed to commit an unlawful act and (2) the defendant[s] knowingly and intentionally joined in the agreement." *Hicks*, 368 F.3d at 805 (quoting *Gardner*, 238 F.3d at 879). In the context of a conspiracy to distribute drugs, the agreement to commit an unlawful act must be "an agreement to commit a crime other than the crime that consists of the sale itself." *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (en banc). Evidence establishing a buyer-seller relationship is not sufficient to support a conspiracy charge. *Curtis*, 324 F.3d at 505. But "evidence showing a shared interest in continued sales over time is enough to permit the jury to draw the inference that a conspiracy exists." *Id.* (citing *United Stats v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994)). Once the conspiratorial agreement is established, the evidence, which may be direct or circumstantial, must also show that the defendants knew about the conspiracy and chose to participate in it.

As we have laid out in detail, the government provided more than sufficient evidence to support the convictions of Carrillo and Herrera for conspiracy to distribute drugs. The majority of the evidence came from Diaz, but also included testimony from agents who had conducted surveillance on the defendants, covert tape recordings, and the title history of the white Cadillac. This evidence, taken in the light most favorable to the government, establishes a conspiracy to import heroin and cocaine from Mexico into the United States and to store the drugs at the home in Palatine. This evidence also establishes Carrillo's and Herrera's knowledge of the conspiracy and their participation in it. The defendants' arguments to the contrary are unavailing.

Carrillo fails in his attempt to analogize himself to defendants for whom we have previously reversed conspiracy convictions because of insufficient evidence. Carrillo's case is much different than that of the defendant in *United*

*States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991), who had his conspiracy conviction reversed because the evidence showed that his role was "confined to bringing the parties [to a drug transaction] together." *Id.* at 1403. Taking the evidence in the light most favorable to the government, it is clear that Carrillo's role was much greater. Carrillo not only recruited members into the conspiracy, he leased the home where the drugs were stored, and provided the necessary equipment and know-how for shipping drugs into the United States. These facts sharply distinguish Carrillo's role from that of the defendant in *Townsend*. Carrillo was not just an intermediary introducing coconspirators. Based upon the evidence, the jury was entitled to conclude that Carrillo was at the very least a member of the conspiracy to distribute drugs. For the same reasons, we reject Carrillo's attempt to rely on *United States v. Goines*. 988 F.2d 750, 764 (7th Cir. 1993) (reversing a conspiracy conviction where the evidence only showed that the defendant had on one occasion bought cocaine from a member of the conspiracy, which merely established a buyer-seller relationship).

We also reject Herrera's argument that his relationship with Carrillo was that of merely buyer-seller. As we have stated, there are a number of factors, none dispositive, to consider when determining whether a conspiracy existed or merely a buyer-seller relationship.[2] *See United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002). The central question is whether there was an agreement for more than just the sale of drugs, and, "where there are adequate indicia of a 'concrete interlocking interest beyond individual buy-sell transactions,'" we will not disturb a jury's finding that a conspiracy existed. *United States v. Melendez*, 401

---

[2] At trial, the jury was instructed to consider these factors, and was admonished that a "simple buyer/seller relationship between a defendant and another person without more is not sufficient to establish a conspiracy."

F.3d 851, 854 (7th Cir. 2005) (quoting *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001)). Here the evidence, taken in the light most favorable to the government, established an "interlocking interest beyond individual buy-sell transactions." *Id.* Significantly, the evidence established that Herrera joined with Carrillo to rent the home where drugs were stored: he had taken cash from Carrillo to pay rent on the home, and he was listed on the lease as "Cousin Pedro." Furthermore, after the white Cadillac stuffed with heroin had been seized by the DEA, it was Herrera, through an attorney, who made attempts to claim the car. This evidence far removes Herrera from the cases he cites such as *Thomas,* where a conspiracy conviction was reversed because there was little or no interaction between the defendants except for a series of drug sales. The evidence amply supports the jury's conclusion that Herrera was part of a conspiracy and not just a mere buyer of drugs.

Nor is the jury's conclusion undermined by Herrera's argument that the government never proved he was aware of, or participated in, the trips to Mexico to import drugs. A conspiracy need not be proved with direct evidence; circumstantial evidence is sufficient. *United States v. Miller*, 405 F.3d 551, 555 (7th Cir. 2005) (citation omitted). And in this case, a jury could have reasonably inferred that Herrera was well aware of the origin of the drugs. Furthermore, to be guilty of a conspiracy, Herrera need not have been aware of where the drugs came from. *See United States v. Plescia*, 48 F.3d 1461, 1462 (7th Cir. 1995) ("While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved nor do they have to participate in every facet of the conspiracy scheme." (quoting *United States v. Auerbach*, 913 F.2d 407,415 (7th Cir. 1990))). Equally unavailing is Herrera's argument that the conspiracy conviction cannot stand because the government allegedly failed to charge Herrera with conspiring to

purchase cocaine from Carrillo, and, instead, only charged Herrera with conspiring to purchase cocaine from Diaz. The superseding indictment actually charged that all of the defendants, including Herrera, Carrillo and others known and unknown, conspired to possess drugs with an intent to distribute. Regardless, "the government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged." *Townsend*, 924 F.2d at 1389.

Herrera also fails in his attempt to challenge the sufficiency of the evidence for his conviction for attempted possession of cocaine with intent to distribute. Because Herrera failed to raise this issue in his post-trial motion under Federal Rule of Criminal Procedure 29(c), we review his challenge for plain error only. *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). Under this standard, we will reverse only if there has been a "manifest miscarriage of justice." *Id.* "Manifest miscarriage of justice is perhaps the most demanding standard of appellate review. We will reverse only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Williams*, 298 F.3d 688, 692 (7th Cir. 2002) (quoting *United States v. Taylor*, 226 F.3d 593, 597 (7th Cir. 2000)).

To prove Herrera guilty of this charge, the government must have shown that he acted with the specific intent to possess and distribute cocaine, and that he took a substantial step toward completion of the offense. *United States v. Magana*, 118 F.3d 1173, 1198 (7th Cir. 1997) (citing *United States v. Cea*, 914 F.2d 881, 887 (7th Cir. 1990)). Herrera only argues that the government failed to prove that he took a substantial step. Taking the evidence in the light most favorable to the government, we easily conclude that the jury's verdict did not result in a manifest miscarriage of justice. Herrera was recorded negotiat-

ing the drug deal and was then apprehended fleeing the place where the deal was to occur. A search of his car found cash in a hidden compartment in an amount consistent with that discussed during the recorded negotiations.

In *United States v. Wilks*, 46 F.3d 640, 645 (7th Cir. 1995), we found sufficient evidence of a substantial step where the defendant "had negotiated the terms of the sale; knew where the transaction was to occur; arrived at that location soon after the terms were agreed upon; and had the exact amount of money in his possession necessary to complete the transaction and obtain possession of the cocaine." The only distinction between *Wilks* and this case is the ambiguity in the negotiations as to whether Herrera would be able to come up with a full $150,000 or just $105,000. While an exact price was not determined, it is clear that a range was agreed upon. It turned out that Herrera was able to raise the higher sum, as the agents seized $150,095 from his car. Under these facts, and considering our prior precedent, it is neither "shocking" nor surprising to us that the jury found Herrera had taken a substantial step.

*B. Severance*

Before trial, Carrillo moved to sever his trial from Herrera's on the basis that Herrera's defense was completely antagonistic to his own. Judge Coar denied the motion. Carrillo now argues that he did not receive a fair trial as a result. At the outset, we mention that Carrillo has waived this issue by not raising it at the close of evidence. *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). But putting waiver aside, Carrillo's argument still fails. The district court is given wide discretion in determining when the prejudice of joinder outweighs the benefits of a single trial. Fed. R. Crim. P. 14; *Rollins*, 301 F.3d at 518. The

preference is for a joint trial of defendants who were indicted together, such as Carrillo and Herrera. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). The mere presentation of mutually antagonistic defenses does not require severance. *Id.* at 538. "In all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002) (quoting *United States v. Blassingame*, 197 F.3d 271, 286 (7th Cir. 1999)). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Carrillo's argument proceeds on two fronts. First, Carrillo argues generally that his defense and Herrera's defense were so "completely" antagonistic that severance was required to be granted. This argument is easily rejected. Herrera's defense at trial was to admit that he was a drug dealer, but to deny that he had any involvement in a conspiracy. Carrillo's defense was that the government could not prove that he had any involvement with drugs. The defenses were not mutually antagonistic. Defenses are mutually antagonistic when "acceptance of one defendant's defense will preclude the acquittal of the other defendant." *United States v. Hartmann*, 958 F.2d 774, 787 (7th Cir. 1992) (quoting *United States v. Bruun*, 809 F.2d 397, 407 (7th Cir. 1987)); *see also United States v. Petullo*, 709 F.2d 1178, 1181-82 (7th Cir. 1983) (citation omitted). Acceptance of Herrera's argument that he was a drug dealer and buyer, but not a member of a conspiracy, did not preclude the jury from also finding that Carrillo was not a member of a conspiracy. And, in any event, severance is not required even if the defenses were mutually antagonistic. *Zafiro*, 506 U.S. at 538-39; *McClurge*, 311 F.3d at 871.

Carrillo's second argument is that a specific trial right, his Fifth Amendment right to remain silent, was compromised during closing arguments. According to Carrillo, Judge Coar was required to declare a mistrial and sever the defendants during closing arguments. In making this argument, Carrillo relies heavily on the Fifth Circuit's decision in *De Luna v. United States*, 308 F.2d 140 (5th Cir. 1962), while ignoring our precedent distinguishing *De Luna. See United States v. Alpern*, 564 F.2d 755 (7th Cir. 1977); *United States v. Hutul*, 416 F.2d 607 (7th Cir. 1969).

In *De Luna*, the Fifth Circuit held that the trial judge was wrong not to sever the trial when it was clear prior to trial that a defendant's attorney would intensely draw the jury's attention to the other defendant's decision to remain silent. 308 F.2d at 141. The defendants in *De Luna* presented mutually antagonistic defenses; the facts were such that a bag of drugs had to belong at least one of them. The attorney for the defendant who had testified made repeated references in closing to the other defendant's decision not to testify, including a final comment to the jury that "at least one man was honest enough and had courage enough to take the stand and subject himself to cross examination, and tell you [the jury] the whole story. . . . You haven't heard a word from" the defendant who chose to remain silent. *Id.* at 142 n.1. Based on the repeated comments regarding the defendant's decision to remain silent and the mutually antagonistic nature of the defenses, the Fifth Circuit found reversible error in the district court's refusal to grant a severance. After *De Luna* was decided, we distinguished it in *Alpern* by holding that "isolated and oblique reference[s] to . . . codefendants' failure to take the stand" could be cured by proper cautionary instructions. *Alpern*, 564 F.2d at 761 (citing *Hutul*, 416 F.2d at 621). We also pointed out that the Fifth Circuit and other circuits had limited *De Luna* "to its own facts, i.e., to cases wherein the defendants rely on mutually inconsistent theories of defense." *Alpern*, 564 F.2d at 761.

Carrillo's case falls comfortably within our prior precedent. Herrera's attorney made an isolated and oblique comment on Carrillo's decision not to testify in an apparent attempt to soften the blow of Herrera's name and contact information being present on the lease of the home in Palatine. As Herrera's counsel argued to the jury, it was Carrillo who had given the leasing agent Herrera's contact information, "[a]nd why he gave that information, I don't know because I can't cross-examine him." Judge Coar called a sidebar and admonished Herrera's counsel. During that sidebar, Carrillo's attorney objected to the comment, and he and the government agreed that Judge Coar should immediately provide a cautionary instruction. Judge Coar then instructed the jury as to the defendants' right to remain silent and the government's burden to prove each of them guilty beyond a reasonable doubt. This fact pattern follows that of *Alpern* and requires the same result, especially in light of the fact that Carrillo's and Herrera's defenses were not mutually inconsistent. *Id.* at 761.

### C. *Ostrich Instruction*

Miranda argues that the court improperly provided the jury with what is commonly known as either an ostrich instruction or a conscious-avoidance instruction. Over Miranda's objection, Judge Coar instructed the jury as follows:[3]

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person has a strong suspicion that things were not

---

[3] Prior to opening statements, Judge Coar provided the jury with preliminary instructions, which included an ostrich instruction. As the government notes, Miranda did not object to that preliminary ostrich instruction, but the government makes nothing more of this and neither will we.

what they seemed or that someone withheld some important fact, yet shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly as I have used that word. You may not conclude that the defendant had knowledge if he or she is merely negligent in not discovering the truth.

Miranda does not object to the instruction's form, which is nearly identical to Federal Criminal Jury Instructions of the Seventh Circuit § 4.06 (1998). But she does argue that giving the instruction was error because the government failed to present evidence that she deliberately and consciously avoided knowledge of illegal activity. The district court's decision to give the ostrich instruction is reviewed for an abuse of discretion, and all the evidence is viewed in the light most favorable to the government. *United States v. Fallon*, 348 F.3d 248, 253 (7th Cir. 2003).

For purposes of criminal liability, deliberately avoiding knowledge of a criminal activity is the same thing as having actual knowledge of that activity. *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986) (explaining that "actual knowledge and deliberate avoidance of knowledge are the same thing"). "The purpose of the ostrich instruction 'is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings.'" *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999) (quoting *United States v. Rodriguez*, 929 F.2d 1224, 1227 (7th Cir. 1991)). It is appropriate to give the ostrich instruction where the defendant claims a lack of guilty knowledge, and the government presents circumstances from which a jury could conclude that the defendant deliberately avoided the truth. *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001).

At trial, Miranda claimed a lack of guilty knowledge. The dispute in this case centers on whether the government presented sufficient evidence that Miranda remained deliberately ignorant. Evidence of deliberate ignorance can be placed into two general categories: evidence of "overt physical acts," and evidence of "purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will." *Craig*, 178 F.3d at 896 (quoting *United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993)). The first category, as we have explained, is generally the easy case, because there is evidence the defendant physically acted to avoid knowledge. *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990). As an example of such a case we gave *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988), where the defendant attempted to distance himself from a drug transaction by "absenting himself from the scene of the actual delivery and sometimes by pretending to be fussing under the hood of his car." *Giovannetti*, 919 F.2d at 1228.

The second category, psychological avoidance, is more troublesome.[4] The act in this category is a mental act—"a cutting off of one's normal curiosity by an effort of will." *Id.* at 1229. This is the category that Miranda's case falls into. The difficulty in a psychological avoidance case—one without any outward physical manifestation of an attempt to avoid facts—lies in distinguishing between a defendant's mental effort of cutting off curiosity, which would support an ostrich instruction, and a defen-

---

[4] In *Giovannetti*, we described the psychological avoidance case as "[t]he true intermediate case between a clearly proper giving of the ostrich instruction because the defendant did physical acts to insulate himself from knowledge, as in *Diaz*, and the clearly improper giving of the instruction because the only issue is the defendant's actual knowledge or complete ignorance." 919 F.2d at 1228-29.

dant's simple lack of mental effort, or lack of curiosity, which would not support an ostrich instruction. *Id.* at 1228-29 (holding the ostrich instruction inappropriate where the defendant "failed to display curiosity, but . . . did nothing to prevent the truth from being communicated to him."). There is generally no way to peer directly into the defendant's thought process to determine whether he or she has become suspicious and then dismissed the uncomfortable thought for fear of its consequences. A person may admit to such thoughts, *United States v. Jaffe*, 387 F.3d 677, 681 (7th Cir. 2004) (affirming an ostrich instruction where the defendant had admitted to investigators that he had "stuck his head in the sand"); *Stone*, 987 F.2d at 471 (explaining that on "cross-examination, [the defendant] acceded to the government's characterization of his actions as 'remaining deliberately ignorant'"), but these instances are rare, and not necessary to the giving of an ostrich instruction.

Our precedent establishes that the circumstances surrounding the defendant alone can be sufficient to allow the jury to infer that the defendant was suspicious but deliberately cut off his or her curiosity in an effort to remain ignorant of guilty knowledge. *See, e.g.*, *Carrillo*, 269 F.3d at 769-70; *United States v. Farouil*, 124 F.3d 838, 844 (7th Cir. 1997); *Stone*, 987 F.2d at 472; *Rodriguez* 929 F.2d at 1227-28*; United States v. Caliendo*, 910 F.2d 429, 434 (7th Cir. 1990); *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir. 1985); *United States v. Burns*, 683 F.2d 1056, 1060 (7th Cir. 1982). The logic behind these cases is that given what the defendant knew, it would be permissible for a jury to conclude that the defendant strongly suspected involvement in illegal activity, but purposely avoided finding out for sure. *Burns*, 683 F.2d at 1060 (explaining that the ostrich instruction "functions as an illustration of how knowledge may be inferred from a defendant's exposure to information"). There is no need to search in vain for an "act" that occurred in the veiled isolation of a defendant's psyche. The

focus is on what the defendant knew and whether the defendant knew enough to support an inference that he or she remained deliberately ignorant of facts constituting criminal knowledge.

Great caution must be exercised, however, in determining which circumstances support the inference of deliberate ignorance. The most important principle for the district court to keep in mind is that the ostrich "instruction is not meant to allow a jury to convict a person for negligence." *Rodriguez*, 929 F.2d at 1227; *Giovannetti*, 919 F.2d at 1228 (citations omitted). The instruction cannot allow a conviction on the basis of mere negligence because if it did, then it would effectively do away with the mens rea requirement of knowledge, thereby impermissibly "reliev[ing] the prosecution of its burden of showing every element of the case beyond a reasonable doubt." *Ramsey*, 785 F.2d at 190.

As explained below, we believe that the ostrich instruction was properly given in this case. Nevertheless, we feel compelled to address Miranda's argument that the government, and in some instances this court, have erred in applying a reasonable person standard when addressing the propriety of the ostrich instruction. We agree with Miranda that a reasonable person standard is not the proper measuring stick for deciding whether to give an ostrich instruction.

As Miranda points out, throughout this case the government has consistently suggested that it is permissible for the jury to infer that Miranda had knowledge because a "reasonable person" in Miranda's position would have been suspicious about the trip to Mexico in February of 2002. We have previously encountered this argument, and rejected it:

> At times during the oral argument of this appeal the government's able lawyer came close to suggesting that the proper office of the ostrich instruction is to enable conviction upon the basis of constructive notice—if a

> reasonable man who knew what [the defendant] knew would have inquired further and discovered the illegal activity, [then the defendant] is an aider and abettor. Not so. Aider and abettor liability is not negligence liability. The abettor and aider must know that he is assisting an illegal activity.

*Giovannetti,* 919 F.2d at 1227-28. Nevertheless, the government's reliance on a reasonable person, while wrong, is understandable. A small minority of our cases, while citing *Giovannetti,* have in dicta supported the giving of an ostrich instruction by analogizing to a reasonable person. *United Sates v. Covarrubias*, 65 F.3d 1362, 1370 (7th Cir. 1995) (citing *United States v. Jackson*, 33 F.3d 866, 875 (7th Cir. 1994) (citing *Giovannetti*, 919 F.2d at 1228)).[5] Furthermore, our previous incantation of the ostrich instruction came close to interjecting negligence into the deliberate ignorance inquiry by telling the jury that "[n]o person can intentionally avoid knowledge by closing his eyes to facts which *should* prompt him to investigate." *Burns*, 683 F.2d at 1509 (emphasis added). But even under that old formulation of the ostrich instruction we repeatedly held, in the face of objections to the contrary, that the instruction "calls for a subjective inquiry, rather than an objective one," and that its focus is on "the defendant himself . . . and *not* a reasonable person." *Id.* at 1061 (emphasis added).

We reaffirm that holding here, and emphasize that it applies to the district court's decision to give the instruction

---

[5] Our circuit is not alone in encountering this confusion. *See United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993) (developing a standard for when the conscious avoidance instruction is warranted and rejecting as too "perilously close to a negligence standard" previous Second Circuit cases approving the instruction where the defendants "*should have been apprised* of . . . the unlawful nature of their conduct."(emphasis in original)).

as well as to the actual wording of the instruction. The focus of the ostrich instruction is on the particular defendant, and not a reasonable person. It asks whether the defendant deliberately avoided knowledge by "shut[ting] his or her eyes." The instruction specifically cautions the jury against finding knowledge on a mere finding of negligence. What follows from this, for purposes of determining whether to give an ostrich instruction, is that a jury must not be invited to infer that a particular defendant deliberately avoided knowledge on the basis of evidence that only supports the inference that a reasonable person in the situation would have deliberately avoided knowledge. As we have said, the instruction should only be given where "there are facts and evidence that support an inference of deliberate ignorance," *Carrillo*, 269 F.3d at 769 (quoting *United States v. Walker*, 25 F.3d 540, 546 (7th Cir. 1994)), and evidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant. *Stone*, 987 F.2d at 472 (explaining that it is improper to use an ostrich instruction "to convict [a defendant] on the basis of what [he] should have known").

Miranda does not argue that Judge Coar applied the wrong standard in his decision to give the ostrich instruction, and we do not believe that he did. Rather, Miranda argues that the evidence did not support the giving of the ostrich instruction. We believe Judge Coar evaluated the evidence in front of him and determined the evidence was sufficient to support the inference that Miranda remained deliberately ignorant of the illegal nature of her trip to Mexico in February of 2002. We agree with Judge Coar's conclusion because the evidence present in the record supported giving the ostrich instruction.

The government highlights the following circumstances surrounding Miranda's trip to Mexico in support of the ostrich instruction: (1) Carrillo, while barely knowing Miranda, offered to give her a car so she could learn to drive to Mexico; (2) Miranda was allowed to keep the car to drive back to Chicago even though she ended up flying to Mexico instead of driving; (3) Miranda never attended the party in Mexico; (4) Miranda drove back from Mexico by herself; and (5) when she crossed the border, the black Cadillac Miranda was driving was searched thoroughly by Border Patrol officers.

The government argues that this evidence is sufficient to support a finding of deliberate ignorance.[6] "[I]t takes a fairly large amount of knowledge to prompt further investigation," *Ramsey*, 785 F.2d at 190, and we are not sure that these facts alone support a finding of deliberate ignorance. Accepting gifts, being ditched before a party, and being searched while driving across the U.S.-Mexico border may be some knowledge that things are not as they seem. But we question whether it is legitimate to infer that Miranda remained deliberately ignorant on the basis of those facts alone. Carrillo giving Miranda a car is not inherently suspicious. The fact that she was to pick this car up in Mexico, and remain there for only a night, certainly raises more questions, but it is not as if Miranda had no ties to Mexico. It is also hard to infer that Miranda was so surprised by Diaz's failure to take her to a party that she must have suspected criminal activity afoot. And we do not put much stock in the Border Patrol's search of Miranda's car. If anything, this seems to cut against giving the ostrich instruction because if trained law enforcement officers could

---

[6] In its brief, the government actually relies upon the wrong standard, arguing that "the events above, in combination, *should have* led Miranda to question what was going on." (Govt.'s Brief at 54) (emphasis added.)

not discern that the black Cadillac was stuffed with illegal drugs, it seems difficult to infer that Miranda did.

The circumstances surrounding the trip to Mexico provide a close question as to whether the ostrich instruction should be given. But there is more in the record to support the giving of the ostrich instruction. The record supports the fact that Miranda had some type of romantic relationship with Diaz, and possibly the beginnings of one with Carrillo. In one sense, this fact helps Miranda's argument against giving the ostrich instruction because a typical scenario supporting an ostrich instruction in a drug-courier-type case involves testimony that the defendant was paid by an anonymous person to deliver a package. *See, e.g.*, *United States v. Vega*, 72 F.3d 507, 517 (7th Cir. 1995); *United States v. Farouil*, 124 F.3d 838, 844 (7th Cir. 1997); *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1407 (10th Cir. 1991).[7] Unfortunately for Miranda, her previous relationship with Diaz cuts both ways, because it also makes it more likely that she knew, prior to February of 2002, that Diaz and Carrillo were involved with drugs. A person's knowledge of his or her cohorts' involvement with illegal or suspicious activities is a fact we have consistently found significant in giving an ostrich instruction. *See, e.g.*, *United States v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998) (defendant had knowledge that the person for whom he was delivering filled trash bags had history of dealing drugs); *Rodriguez*, 929 F.2d at 1227 (jury could infer from defendant's admissions that he knew his coconspirators were involved with drugs); *Caliendo*, 910 F.2d at 434 (defendant had been present when her coconspirators discussed illegal operations). At trial Diaz testified that prior to her trip to Mexico, Miranda knew Diaz and Carrillo were involved with

---

[7] Miranda relies on certain aspects of *de Francisco-Lopez* to argue against the giving of the ostrich instruction, but, as we explain, we find this case from outside of our circuit distinguishable.

drugs. This evidence provides a whole new context for Miranda's trip to Mexico. Now she was not just accepting a car as a gift and driving it home; she was flying to Mexico and driving a car across the border for a man she knows to be involved with drugs.

Miranda argues that this testimony cannot be considered when evaluating the propriety of the ostrich instruction because it only goes to actual knowledge. Miranda is wrong. The basis of her argument is our admonishment that an ostrich instruction should not be given "when the facts require the jury to make a 'binary choice' between 'actual knowledge' and 'complete innocence.'" *Giovannetti*, 919 F.2d at 1228 (quoting *United States v. Bigelow*, 914 F.2d 966, 971 (7th Cir. 1990)). We agree that some of Diaz's testimony only supports a finding of actual knowledge, and, therefore, it cannot be used to bolster an argument in favor of an ostrich instruction. For example, Diaz's testimony that Miranda was told by Carrillo that the black Cadillac would contain drugs is evidence only supporting a finding of actual knowledge. This evidence only provides the jury with the "'binary choice' between 'actual knowledge' and 'complete innocence,'" and, therefore, it cannot support the giving of an ostrich instruction. *Id.*

But it does not follow that evidence must be placed in either an actual knowledge category or a deliberate ignorance category. It is permissible for the government to present evidence supporting both theories, *Carrillo*, 269 F.3d at 769, and some of the government's evidence might be relevant to both actual knowledge and deliberate ignorance. Diaz's testimony that Miranda knew of his and Carrillo's involvement with drugs prior to February of 2002 is illustrative. The jury could rely on it to infer that Miranda actually knew she was transporting drugs. The jury could lump it with Diaz's testimony that Miranda was told the black Cadillac would have drugs and conclude that she actually knew she was transporting drugs. The jury

could also rely on that evidence to conclude that Miranda deliberately avoided discovering whether there were drugs in the black Cadillac. The jury could choose not to credit Diaz's secondhand recounting of what Carrillo told Miranda, but could still have believed Diaz when he said Miranda was present for the drug deals. The jury could have then used that evidence, in combination with Miranda's trip to Mexico, to conclude that Miranda deliberately avoided knowing whether she was transporting drugs. The point is that this evidence does not require the jury to choose between either actual knowledge or complete innocence. It also supports an inference of deliberate ignorance. Therefore, it is perfectly appropriate to consider this evidence when evaluating the propriety of the instruction.

Thus, the evidence supports the inference that Miranda knew Diaz and Carrillo were involved with drugs. After knowing this, at Carrillo's behest, she registered the black Cadillac in her name. She then accepted a flight to Mexico (via Odessa) from Carrillo. She purportedly was going to attend a party in Mexico, but no party occurred. After spending only one night in Mexico she drove the black Cadillac across the border. Miranda did not keep the black Cadillac, but instead the car was eventually returned to Diaz and was found in his garage in Palatine by law enforcement officials with the driveshaft removed. This evidence is sufficient to support an inference of deliberate ignorance. While Miranda posited innocent explanations for all of these facts, the jury did not have to credit those explanations. We affirm Judge Coar's decision to give the ostrich instruction.

## D. *Paladino Remand*

Carrillo and Herrera also argue that their Sixth Amendment rights were violated by Judge Coar's application of the

Sentencing Guidelines. Their argument was not preserved in the district court. Accordingly, we order a limited remand in accordance with *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005) to permit Judge Coar to determine whether he would reimpose the same sentence.

### III.  CONCLUSION

For the foregoing reasons, we affirm the convictions of Carrillo, Herrera, and Miranda. With respect to Carrillo and Herrera, we order a limited remand in accordance with *Paladino*.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
