In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2046

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GEORGE PABEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:10 CR 17—**James T. Moody**, *Judge*.

ARGUED OCTOBER 19, 2011—DECIDED DECEMBER 28, 2011

Before FLAUM and MANION, *Circuit Judges*, and MAGNUS-STINSON, *District Judge*.*

FLAUM, *Circuit Judge*.  On September 24, 2010, George Pabey, former mayor of East Chicago, and Jose Camacho, East Chicago's head of the Engineering Department,

---

* The Honorable Jane E. Magnus-Stinson, United States District Court for the Southern District of Indiana, sitting by designation.

were convicted of conspiring to embezzle government funds and embezzling government funds. According to the district court, Pabey and Camacho used government funds and government employees to renovate a house (the "Property") that Pabey and his wife purchased in October 2007. During trial, Pabey claimed that he was unaware of the scheme to use city funds and employees. In response to this denial, the district court gave the jury a conscious avoidance instruction, informing them that Pabey's knowledge of the scheme can be inferred if they find that he deliberately avoided the knowledge necessary for his conviction. The jury convicted Pabey, and he appeals the court's issuance of the conscious avoidance instruction.

In the event that we do not upset his verdict, Pabey asks that we reduce the length of his sentence. Pabey was given an initial offense level of 10 under the United States Sentencing Guidelines ("U.S.S.G."), but the court increased his offense level with several enhancements. The court applied a two-point enhancement for obstruction of justice, a four-point enhancement for Pabey's leadership role in the offense, and a two-point enhancement for abuse of a position of trust, bringing Pabey's total offense level to 18. With a criminal history level of one, Pabey's guideline range was 27-33 months' imprisonment. The district court found that Pabey's offense warranted an upward departure from the guidelines and sentenced him to 60 months' imprisonment, along with a $60,000 fine, more than $14,000 in restitution, a $200 special assessment fee, and three years of supervised release. Pabey contests each of the sentence enhance-

ments as well as the reasonableness of the court's upward departure from the sentencing guidelines.

For the following reasons, we affirm both Pabey's conviction and the sentence imposed by the district court.


## I. Background

George Pabey was born in East Chicago, Indiana and has remained a lifetime resident. He has worked as an employee for East Chicago for roughly three decades, serving on the police force for 22 years, as the police chief for one year, as a councilman for four years, and as mayor since 2004. Throughout this time, Pabey and his wife Hilda owned several pieces of property. Pabey confesses that he is not what one would call a "handyman," so any time their properties needed tending they enlisted the help of their family and friends. Specifically, Pabey would often seek the help of his good friend and political supporter Jose Camacho—who also served as Pabey's Engineering Supervisor during Pabey's mayoral tenure—and Angel Acosta—another city worker who was friendly with the Pabeys. In the past, Camacho, Acosta, and other friends would not charge anything for their help, but Pabey and Hilda would personally pay for all the supplies and costs associated with the projects. Other times, Pabey and Hilda would pay workers—including off-duty city workers—to help with their repair needs.

In October 2007, Pabey decided to purchase a house for his daughter in Gary, Indiana. He found the

Property, which had been foreclosed upon, and asked Camacho and Acosta to accompany him to the house to see whether it was worth purchasing. Camacho and Acosta determined that the Property needed a good amount of work, but was salvageable. Prior to any work being completed, the Property was appraised at $67,000. Pabey agreed to buy the house, and in December 2007, Camacho took the lead on the improvements that the Property required. By May 2009, the house was worth $135,000. The $68,000 increase in value was largely attributable to an embezzlement scheme aimed at using East Chicago resources to complete the renovation of the Property. The pertinent question in the case at hand is whether Pabey was aware of that embezzlement scheme. On February 3, 2010 a federal grand jury returned a four-count indictment indicating that Pabey may have been privy to the plan. While counts three and four applied only to Camacho, both defendants were charged with count one of conspiring to embezzle local government funds under 18 U.S.C. § 371 and count two of embezzling local government funds under 18 U.S.C. § 666(a)(1)(A). The defendants' jury trial started on September 20, 2010.

According to the government's evidence at trial, there were two methods of embezzlement employed by Camacho and Pabey to repair the Property. First, Camacho bought dozens of items that were installed at Pabey's new house by using his authority to charge purchases to the city's accounts at Menards and Joseph's Hardware. Among the items purchased using the city's money were the following: (1) front and rear entry doors

and locks; (2) a gas water heater; (3) doors and drawer handles for the kitchen cabinetry; (4) a bathtub and adjustable shower head for the main floor bathroom; (5) interior paint; (6) items used to finish the basement including 2X4s, drywall, corner bead, paint, primer tile, and grout; (7) an exhaust fan and other items for the basement bathroom; (8) light fixtures to be installed throughout the home; and (9) wood materials used to construct a staircase and full bar in the basement. When items were purchased on one of the city's accounts, the city controller would ultimately be responsible for paying off the claims, but neither of the parties suggested that the controller had any knowledge of the embezzlement scheme. As Pabey points out, there were some items installed that were not charged to the city, including appliances, fixtures, carpeting and countertops (which the Pabeys paid for) and a furnace (which Acosta paid for).

The second form of embezzlement involved Camacho's use of on-the-clock city workers—all of whom reported to him—to complete the renovation project. In his brief, Pabey notes that not all of the work was completed by city workers on city time. His friend Benedicto Diaz was not a city worker, and he provided much help with the project. Acosta was an upper-level city worker, so he was able to take compensatory time while he worked on the Property. But the government put forth evidence at trial that at least five city workers other than Camacho and Acosta helped renovate the Property at times during which they were being paid by the city of East Chicago. They were each told that their work on the Property, which was not located within the confines

of their employer city of East Chicago, was a "special assignment." The amount of time each of them spent working on the house ranged from two to thirty workdays. At least one employee, however, refused to work on Pabey's house. Alex Sanchez, who worked directly under Camacho, refused to go into Pabey's new home, and told Camacho not to use any of Sanchez's subordinates on the "special assignment." According to the government's evidence, Camacho assured Sanchez that the workers could be trusted and that they would not talk.

The government also presented certain circumstantial evidence at trial suggesting that Pabey either knew of Camacho's scheme to use government resources or purposefully avoided the obtainment of such knowledge. In an effort to illustrate that Pabey was aware of the use of city employees, the government put on evidence of Pabey's, Camacho's, and Hilda's encounters with city workers at the Property. For instance, Stojan Novakovic, a city worker from the Engineering Department, testified that he saw Pabey at least three times at the Property during the workday. Pabey knew Novakovic for 20 years and had paid Novakovic to do work on other properties he owned, but when Pabey saw Novakovic working on the Property during work hours, he did not offer to pay Novakovic, nor did he inquire as to why Novakovic was working on Pabey's house during work hours. Hilda, on the other hand, gave Novakovic specific directions regarding what rooms needed to be painted. Edward Bittner—a city employee who did work both on and off the clock—was

also offered payment by Pabey for his off-duty efforts, but was not offered any money for his work while on the job.

To further support its theory, the government provided evidence that highlighted Camacho's deep involvement in the renovation of the Property juxtaposed with Pabey and Camacho's very close relationship. For instance, there were 50 different weekdays where Camacho made cell phone calls during work hours while at the Property.[1] There were also 186 calls between Camacho and Pabey's cell phones from October 2007 to May 2010. Finally, Pabey was seen at the Property with Camacho by several workers on several occassions.

Regarding the use of city funds, the government attempted to prove that Pabey knew—or consciously avoided the knowledge—that the supplies for the renovation were purchased on the city's accounts at Menards and Joseph's Hardware. The government's evidence revealed one incident where Pabey, Camacho, and Hilda rented a sander from Menards. The Pabeys paid for the rented sander, but the next day, Camacho paid for a shop vac, sandpaper, and drop cloth on the Engineering Department's account, and later that day Pabey re-

---

[1] In Gary, Indiana, any call made from a cell phone will be transmitted from a cell phone tower within two miles of the phone's location. The district court found that the routing of Camacho's calls through the cell phone tower near the Property was conclusive proof that Camacho was at the Property, especially since the home was not in East Chicago.

turned the sander they had rented. The government also presented evidence that during past home improvement projects, the Pabey's kept detailed receipts of all transactions, but for this project, they simply requested that Camacho put all receipts in a brown envelope—an envelope they did not open until months after all renovations had been completed. Further, Hilda testified at trial that she usually paid for supplies with check or credit card in the past, but for the Property there was only one non-cash expenditure: a $600 check for plumbing supplies.

Pabey's defense at trial involved a denial of any knowledge that city workers were being paid while working at his house or that the materials purchased for his house were bought by the city. Pabey claimed that he paid Camacho cash for items Camacho needed to buy for the renovations, and that Camacho must have pocketed the money if government funds were used to purchase the materials. Pabey supported this theory with the testimony of his wife, Hilda.

Hilda testified that in this situation, as in the past, she did not pay Acosta or Camacho for their work on the Pabeys' property. She testified that she would either accompany them to buy materials herself, she would give them cash to go purchase the materials, or she would reimburse them for any expenditures they made. Hilda admitted that she never directly took a receipt from Camacho, and that no receipts existed for the drywall installed, the 2X4s used, the door knobs, or the door locks, but she insisted that she was unaware of

any purchases from Menards using city money. She said that she gave Camacho money for the doors that were installed, despite the fact that the city paid for those doors. She also claimed that the knobs that were attached to the cabinets were knobs that she had lying around the house, and her explanation for the fact that Camacho had bought the exact same knobs with city money was that it must have been a coincidence. She also claimed that she is positive she bought the blue and purple paint that was used in the house, though Camacho had bought the exact same paint at Menards on the Engineering Department's account. Finally, Hilda claimed that she purchased the chandelier in the Gary home for $25—the exact same model that Camacho bought at Menards for $59.99, again with city money.

At the conclusion of trial, the district court gave Final Instructions to the jury. Final Instruction No. 31 was a conscious avoidance instruction—often referred to as an ostrich instruction—and was in line with the Seventh Circuit pattern jury instructions. The instruction stated:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

Pabey objected to this instruction, asserting that no evidence was presented showing that he deliberately avoided knowledge of the scheme. The district court overruled this objection, finding that the evidence supported the ostrich instruction.

On September 24, 2010, Pabey was found guilty on both counts. At his sentencing hearing, Pabey's base offense level was set at six under U.S.S.G. § 2B1.1(a)(2), but was increased four levels because the loss amount from his embezzlement was between $10,000 and $30,000. *See* U.S.S.G. § 2B1.1(b)(1)(C). The presentence report ("PSR") recommended an increase of four levels because Pabey was the organizer or leader of a scheme that involved five or more criminal participants and an increase of two-more levels because Pabey abused his position of trust. U.S.S.G. §§ 3B1.1(a), 3B1.3. The district court accepted the PSR's recommended increases and added a two-level increase because Pabey obstructed justice by suborning perjured testimony from his wife, Hilda. U.S.S.G. § 3C1.1. Pabey's total offense level was therefore set at 18, and with a criminal history level of one, the guideline range for his sentence was 27-33 months. The district court also found that Pabey was deserving of a sentence above the range due to the aggravating circumstance of the loss of public confidence in the honesty and integrity of elected officials as a result of his crime, which caused a substantial nonmonetary harm and a significant disruption of a governmental function. Thus, the court sentenced Pabey to 60 months' incarceration, a $60,000 fine and a $200 special assessment fee, all on top of the $14,405.14 in restitution that Pabey owed the city.

Pabey appeals on several grounds. First, Pabey challenges the propriety of the ostrich instruction given the evidence presented at trial. Second, Pabey challenges the offense-level increases to his guidelines calculation based on obstruction of justice, role in the scheme and abuse of position of trust. Finally, Pabey challenges the reasonableness of the district judge's divergence from the sentencing guidelines range.

## II. Discussion

### A. Ostrich Instruction

Pabey claims that the district court abused its discretion by permitting the jury to receive the conscious avoidance instruction, or "ostrich" instruction, and that absent this instruction, the jury would not have convicted him. The purpose of the ostrich instruction is to inform jurors that the legal definition of "knowledge" includes the deliberate avoidance of knowledge. *United States v. Fallon*, 348 F.3d 248, 253 (7th Cir. 2003). Thus, a defendant cannot avoid criminal liability by sticking his head in the sand to purposefully avoid the knowledge that he is involved in criminal dealings. *United States v. Green*, 648 F.3d 569, 582 (7th Cir. 2011). We have cautioned that the ostrich instruction is inappropriate in situations where the evidence only supports a finding that the defendant *should have* known or strongly suspected that criminal dealings were afoot. *See United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009); *see also United States v. Carrillo*, 435 F.3d 767, 782 (7th

Cir. 2006) ("[E]vidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant."). Such a standard would lead to convictions based on mere negligence regardless of the appropriate level of mens rea for a given crime, completely abrogating the mens rea requirement of knowledge. *Carrillo*, 435 F.3d at 781. Thus, an ostrich instruction is only appropriate when two circumstances are present: "(1) a defendant claims a lack of guilty knowledge and (2) the government presents evidence that suggests that the defendant *deliberately* avoided the truth." *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010) (emphasis added). It is undisputed that Pabey claimed a lack of guilty knowledge at trial, so the only question to answer regarding this issue is whether the government presented sufficient evidence for a reasonable jury to find that Pabey deliberately avoided the truth behind the embezzlement scheme. Pabey argues that he did not deliberately avoid the truth, but was simply negligent in failing to discover Camacho's embezzlement. We review the district court's finding that evidence existed to support the ostrich instruction for abuse of discretion, and we view all evidence in the light most favorable to the government. *United States v. Garcia*, 580 F.3d 528, 537 (7th Cir. 2009).

There are two types of evidence that can illustrate a defendant's deliberate attempts to remain ignorant. *Carrillo*, 435 F.3d at 780. First, a prosecutor can show

that the defendant committed overt physical acts to avoid the knowledge. *Id*. In *United States v. Giovannetti*, for instance, we held that a landlord who changed his route to work to avoid driving past suspicious tenants would be engaging in deliberate avoidance, but a landlord who did not alter his route in order to check up on the house was merely failing to show curiosity. 919 F.2d 1223, 1228 (7th Cir. 1990). Second, the prosecutor can undertake the more difficult task of showing purely psychological avoidance, otherwise described as the "cutting off of one's normal curiosity by an effort of will." *Carrillo*, 435 F.3d at 780. While the difference between a defendant lacking curiosity and a defendant who affirmatively cuts off his curiosity is scant, we have established that a jury can infer the deliberate avoidance of knowledge from circumstantial evidence alone. *Carrillo*, 435 F.3d at 781. The key determinations to make when examining this type of evidence are therefore "what the defendant knew and whether that knowledge raises a reasonable inference that [he] remained deliberately ignorant of facts constituting criminal knowledge." *United States v. Ramirez*, 574 F.3d 869, 877 (7th Cir. 2009). An example of psychological avoidance can be found in *United States v. Leahy*, where the defendant, an insurance broker for a temp agency, was convicted of mail and wire fraud in connection with the temp agency's insurance fraud scheme. 464 F.3d 773, 794 (7th Cir. 2007). We held that an ostrich instruction was appropriate in *Leahy* since the defendant asked no questions about the company's auditing problems despite his exposure to "numerous red flags, obvious to someone with his

training and experience, over the duration of his business relationship with [the temp agency]." *Id.* at 796.

In the case at hand, the government presented both types of evidence to show that if Pabey was unaware of the embezzlement scheme surrounding the Property, then he deliberately avoided such knowledge. To begin with, the government presented evidence that Pabey acted differently in this situation than he had during the renovation of other properties he owned, suggesting that he was avoiding the true nature of the renovations. For instance, the government put forth evidence that Pabey either did pay or offered to pay Novakovic and Bittner in the past for work they did for him around his properties. Pabey also either paid or offered to pay Bittner for work he did on the air conditioning unit of the Property at issue in this case. Yet Pabey did not even acknowledge the work Bittner and Novakovic did for him while they were on the clock. This is in spite of the government's evidence that Pabey had known Novakovic for 20 years, and he witnessed both Bittner and Novakovic working on his house during work hours. Pabey also avoided looking at the receipts that Camacho was putting into a brown envelope kept at the Property, allegedly accounting for all of the expenditures that were made by Pabey for the renovation. There was evidence suggesting that in the past, Pabey and his wife kept detailed receipts for home projects, yet they did not so much as glance at receipts in the brown envelope until nine months after the renovation had started. From this, a jury could have reasonably found that Pabey parted from his normal behavior in order to

avoid any knowledge of wrongdoing, much like the hypothetical driver described in *Giovannetti*.

The government also provided evidence that Pabey ignored multiple red flags regarding the nature of his renovation. According to the government's evidence, Pabey was confronted with several situations which strongly suggested that city workers were renovating his house while on the clock, but he did not confront these workers or ask Camacho how they could be doing non-government work during the middle of the day. As mentioned above, Pabey knew Novakovic for over 20 years and had paid him to work on his house in the past, yet Pabey allegedly said nothing but "hello" to Novakovic when Pabey saw him working on the house during work hours. The court found that Pabey's wife Hilda, however, did talk to Novakovic during work hours and asked him to paint several walls. Pabey also spoke with Camacho many times during work hours while Camacho was at the Property. Given that they were life-long friends, a jury could infer that Camacho informed Pabey that he was at the Property observing the renovations during work hours. Pabey neglected to ask Camacho if he was taking compensation time or vacation time during the roughly 50 days Camacho spent at Pabey's house conducting renovations. Finally, many of the items installed in Pabey's Property were paid for by the Engineering Department of East Chicago. Despite these big ticket items continually showing up at the Property, Pabey did not question how all the items were being paid for. Pabey reminds us that he did pay for some items, but viewing the evidence

in the light most favorable to the government, this fact could actually hurt Pabey. If Pabey was paying for some but not all of the items, where did he think the rest of the merchandise was coming from? Pabey's failure to ask that question is enough for a jury to conclude that he consciously avoided the answer. All these red flags, along with the court's finding that Pabey was usually a "hands-on mayor," suggest that Pabey deliberately avoided incriminating knowledge while reaping numerous benefits.

In his brief, Pabey argues that Camacho was the perpetrator of this fraud, that Camacho was pocketing the money Pabey gave him for supplies, and that Pabey, therefore, was a victim. In support of this theory, Pabey supplied evidence that Camacho did not want Pabey to know that city resources were being used for the renovation. First of all, the jury was free to reject this evidence. The only question that matters in this review for abuse of discretion is whether enough evidence existed for a jury to reasonably conclude that Pabey either had incriminating knowledge or deliberately avoided incriminating knowledge. Second, the amount of knowledge that Camacho intended for Pabey to acquire is irrelevant when determining the amount of knowledge Pabey actually had and the number of red flags Pabey ignored. A reasonable jury could have found that Pabey was not just negligent in his alleged ignorance of the scheme to embezzle money from East Chicago, but that he either knew of the scheme or deliberately avoided knowledge about the scheme. The district court was therefore within its discretion in issuing an ostrich instruction.

**B.  Sentencing Enhancement Challenges**

Pabey also argues that even if he was properly found guilty, the court improperly increased his sentence under the U.S.S.G. At sentencing, the government carried the burden to prove, by a preponderance of the evidence, that the sentencing enhancements discussed below applied to Pabey. We review the court's findings of fact for clear error, giving special deference to the court's findings based on witness credibility. *United States v. Banks-Giombetti,* 245 F.3d 949, 954 (7th Cir. 2001). We review de novo whether those facts adequately support the three enhancements levied on Pabey. *United States v. Taylor*, 637 F.3d 812, 817 (7th Cir. 2011).

**1.  Obstruction of Justice Enhancement**

Section 3C1.1 of the U.S.S.G. provides for an increase of a defendant's offense level if:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

The district court held that Hilda provided false testimony with regard to the origin of certain items that were installed at the Property, namely, the knobs for the Pabeys' cabinets, blue and purple paint, and a chandelier. The court also found that Hilda lied when she claimed

that she never saw Camacho at the Property during her numerous visits during the workday. Further, the court held that Pabey suborned this perjury, given his spousal relationship with Hilda and her clear motive to further Pabey's theory that he lacked any knowledge about the use of city workers or city funds on the Property. Even if Pabey did not actually ask or pressure Hilda to falsely testify, the court reasoned, he used her testimony as his main defense knowing that it was not true, which amounts to suborning perjury. *United States v. Bradberry*, 466 F.3d 1249, 1255 (11th Cir. 2006). Pabey does not dispute that he used Hilda's testimony in his defense, but argues that the testimony regarding these topics was not perjury. Suborning perjury undoubtedly constitutes obstruction of justice for the purposes of U.S.S.G. § 3C1.1, *United States v. DeLeon*, 603 F.3d 397, 403 (7th Cir. 2010), so the question at issue is whether the district court clearly erred in finding that Hilda's testimony was perjurious.

Two elements must be present for a finding of perjury—and thus, in this case, subornation: (1) a witness provides testimony falsely with willful intent, and (2) that testimony is material. *United States v. Rodriguez*, 995 F.2d 776, 779 (7th Cir. 1993). As stated above, the district court found that Hilda's testimony regarding the knobs, paint, and chandelier was false, as was her testimony that she did not see Camacho during workdays at the Property. The district court based this conclusion on the testimony's incompatibility with documentary evidence—such as the receipts and SKU numbers indicating that the items used in the Property were purchased by

the Engineering Department—and the testimony of other witnesses—such as the workers that saw both Camacho and Hilda at the house on many occasions. The district court also found that this false testimony was provided willfully, given Hilda's very assertive and combative nature in answering questions about these topics.

In challenging this finding, Pabey cites application note 2 for § 3C1.1, which states that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." Pabey argues that Hilda's false testimony falls into one of the categories mentioned in note 2. He claims that Hilda was simply mistaken about which knobs were used on the cabinets—the knobs she allegedly owned or the identical knobs that Camacho bought with city money. She failed, however, to account for the current whereabouts of the set of knobs she claimed to have originally owned. She speculates that Camacho put them somewhere else, but it was not clear error for the court to reject this story that lacks evidentiary support. Hilda's suggestion that she bought a chandelier identical to the one that Camacho had installed in the Property is similarly lacking in support. Pabey also argues that it is possible that both Hilda and Camacho bought the same kind of paint, and that Camacho and the other workers had to use both sets of paint for the house, making Hilda's testimony accurate. Once again, it was reasonable for the district court to conclude that

this story is simply made up, especially given the district court's unique ability to determine the credibility of witnesses. Finally, Pabey argues that the nature of Camacho's job was such that he was on call 24/7, 365 days a year, and that Hilda was simply confused when asked if she saw him "during work hours." This argument is misleading. The sentencing transcript suggests that Hilda was not asked whether she saw Camacho while he was on the clock, but rather whether she saw him during the normal work hours of seven in the morning to three in the afternoon. Her testimony, therefore, could not have been the result of confusion about his schedule or his payment arrangement with the city. The district court's finding that Hilda willfully testified falsely is not clear error.

Pabey also argues that the allegedly perjured testimony was not material to the case. If, however, Pabey's wife was aware that city employees were working on the Property while on the clock and city money was funding the renovations, Pabey was much more likely to have been aware of those facts as well. Given that Pabey's knowledge about these facts was the central issue in this case, the testimony was obviously material. *See United States v. Spagnola*, 632 F.3d 981, 989 (7th Cir. 2011).

Since the district court did not clearly err in finding that Hilda gave perjured testimony and Pabey suborned that perjury, the obstruction of justice enhancement was not inappropriate.

### 2. Role in the Scheme Enhancement

Pabey next contests the district court's enhancement based on Pabey's role as the leader of the scheme to defraud East Chicago. Section 3B1.1 of the U.S.S.G. states the following:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The district court held that Pabey was, in fact, the leader of the scheme in question, and that there were five or more criminal participants in this scheme, including Pabey, Camacho, and several other low-level employees. Pabey challenges both of these findings.

In determining whether Pabey was the leader of this scheme, we must remain cognizant of the fact that Pabey's de jure control over all city workers is not necessarily dispositive; he must have control over participants with regard to the actual scheme to be eligible for this enhancement. *See United States v. DeGovanni*, 104

F.3d 43, 45 (3d Cir. 1997). There are six factors a district court must consider when examining a defendant's leadership role in a conspiracy:

> (1) exercise of decision-making authority; (2) participation in committing the offense; (3) recruitment of accomplices; (4) degree of participation in planning or organizing the criminal activity; (5) degree of control or authority exercised over others involved in the criminal activity; and (6) the nature and scope of the illegal activity.

*United States v. Hollins*, 498 F.3d 622, 632 (7th Cir. 2007) (citing *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003)). In applying these factors, the district court found it relevant that Pabey recruited Camacho to renovate his house (who in turn recruited all the others), that Pabey met with Acosta and Camacho to discuss potential improvements to the house, that Pabey received the entirety of the benefit from the scheme, and that all the workers who helped repair the house owed their jobs to Pabey in one way or another. Pabey contests that these findings make him a leader, arguing that he could not have been the leader of a scheme of which he was unaware. He claims that Camacho paid for the home improvement items with city money and pocketed the money received from Pabey, thereby benefitting from the scheme. In support of this theory, he once again cites the trial testimony regarding Camacho's statements that Pabey would be upset upon learning about the scheme. This story is a repackaging of Pabey's general defense theory. While

the story, if believed, would clearly preclude a finding that Pabey led the scheme, the jury rejected this theory, and the court did not commit error by rejecting it as well.

Pabey also challenges the finding that this conspiracy either involved five or more participants that were criminally culpable or was "otherwise extensive," one of which must be true for a four-point sentence enhancement to apply under U.S.S.G § 3B1.1. *United States v. Tai*, 41 F.3d 1170, 1173 (7th Cir. 1994). We have stated that a person need not have been charged or convicted to be a participant in a crime; rather, a participant need only be criminally responsible, meaning the participant *could have* been charged. *United States v. Mandel*, 15 Fed. Appx. 369, 374 (7th Cir. 2001). Further, mere knowledge of a conspiracy is not enough to render one criminally responsible, but knowingly assisting a criminal enterprise makes one criminally responsible as an accessory. *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996).

Only one of the workers under Pabey and Camacho affirmatively stated that he knew doing the work on Pabey's house was illegal. But the fact that the employees were performing work on property in a different city than East Chicago, along with Camacho's continued references to their work for Pabey as a "special assignment," was likely enough to make them accessories, in that they knew the work was illegal and they helped advance the scheme anyway. Regardless of whether the subordinate workers were criminally responsible, however, the scheme at issue was "otherwise extensive," and thus the court's imposition of this enhancement

was justified under U.S.S.G. § 3B1.1. application note 3 of § 3B1.1 clarifies that under the "otherwise extensive" prong, all persons involved in a scheme, whether they are aware of the scheme or not, should be considered. U.S.S.G. § 3B1.1, application note 3. Thus, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* In *United States v. Tai*, we used application note 3 to conclude that the "otherwise extensive" prong can be satisfied if the total number of criminal participants and outsiders that unwittingly advance a conspiracy is greater than five. 41 F.3d at 1174-75. Here, the participation of Pabey, Camacho, at least five lower-level city workers, and the city controller satisfies this standard whether or not the lower-level workers were aware of the scheme's illegality. Thus, at the very least, this scheme is "otherwise extensive" and the enhancement is appropriate.

### 3. Abuse of Position of Trust Enhancement

The final enhancement that Pabey challenges is an enhancement based on Pabey's abuse of his position of trust. As § 3B1.3 of the U.S.S.G. states, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." Pabey does not contest that he occupied a position of trust, but claims that his position did not facilitate the commission or concealment of his offense.

Occupying a position of trust and participating in illegal activities do not, by themselves, render an en-

hancement for abuse of trust proper. *United States v. Gould*, 983 F.2d 92, 94 (7th Cir. 1993). The position held by the defendant must have made the commission of the offense significantly easier, *id.*, not merely helped incidentally. *United States v. Holt*, 170 F.3d 698, 704 (7th Cir. 1999). In this case, the district court found pertinent the fact that Pabey had control over both the money and the people involved in the scheme, including Camacho, who directly spent the city's money, and the city controller, who unknowingly approved those illegal expenditures. The district court also noted that no other citizen could have obtained the benefits Pabey received by using city resources to improve his piece of property, especially since the property was not even located in his city of East Chicago.

Pabey argues that several of the city workers implicated in this scheme had helped him repair other pieces of property before he was mayor, so his position could not have been the reason that city employees helped renovate the Property. This argument does not confront the fact that Pabey would not have had access to on-the-clock workers or the city's Menards and Joseph's Hardware accounts without his position. Paybe also argues that it was not he, but the controller of the city that was paying out the fraudulent claims made to Menards and Joseph's as a result of Camacho's purchases on city accounts. But this point is unrelated to the fact that Pabey knowingly allowed illicit benefits to funnel his way, and he would not have had this opportunity were it not for his position as mayor.

The district court's finding that Pabey used his position of trust to obtain benefits was not clear error, and the enhancement for abuse of trust was therefore proper.

## C. Divergence from Guidelines

Pabey's final objection is that the district court's upward departure from the guidelines was inappropriate. "The court reviews the reasonableness of a sentence under an abuse of discretion standard," *United States v. Pineda-Buenaventura*, 622 F.3d 761, 778 (7th Cir. 2010), and a sentence above the guidelines range is not presumed to be unreasonable. *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008). In determining whether to vary from the Guidelines range, a judge must consider the factors put forth in 18 U.S.C. § 3553(a). *Id*. A major departure requires a more significant justification, *id.*, but a judge need not provide an extraordinary justification. *United States v. Schlueter*, 634 F.3d 965, 967 (7th Cir. 2011).

The district court's explanation of its divergence from the guidelines adequately discussed its application of the § 3553(a) factors, which include "the nature and circumstances of the offense," "the need for the sentence imposed . . . to reflect the seriousness of the offense," and "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a). The court discussed the seriousness of the offense given the decades of corruption East Chicago citizens have faced, their poverty rate, and the fact that their government has had to lay off scores of employees recently. The court also discussed Pabey's campaign

promise to rid the government of corruption, on which many voters relied, thus increasing his culpability. Finally, the court discusses the need for deterring this type of behavior in East Chicago, both generally and specifically, given the rampant corruption that has existed in East Chicago for the last several decades.

In further support of its departure, the district court cited application note 19 of U.S.S.G. § 2B1.1, which suggests an upward departure from the guidelines based on the risk of non-monetary harm, and U.S.S.G. § 5k2.7, which suggests an upward departure if the defendant's conduct significantly disrupted a government function. The district court found that Pabey's actions would result in a loss of public confidence in the honesty and integrity of elected officials, and that this loss of public confidence is both a non-monetary harm and a disruption of a government function.

The district court provided adequate support for its upward departure based on the § 3553(a) factors, and further supported its departure using the U.S.S.G. recommendations, and thus the district court was within its discretion to depart in this fashion.

### III. Conclusion

For the reasons discussed above, we AFFIRM George Pabey's conviction and the sentence imposed by the district court.