In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1407

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RITA A. CRUNDWELL,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 12 CR 50027 — **Philip G. Reinhard**, *Judge*.

ARGUED NOVEMBER 4, 2013 — DECIDED NOVEMBER 15, 2013

Before EASTERBROOK, KANNE, and TINDER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. In 2011 a Commissioner of Dixon, Illinois, the childhood home of President Reagan, lauded Rita Crundwell, the City's Comptroller since 1983, because "she looks after every tax dollar as if it were her own." How right he was. The next year Crundwell pleaded guilty to embezzling approximately $53 million from the City between 1990 and 2012. She used the money to support more than 400 quarter horses and a lavish lifestyle, which

she explained to co-workers as the fruit of the horses' success. During the final six years of her scheme, the embezzlement averaged 28% of the City's budget. In exchange for her guilty plea, the prosecutor limited the charge to a single count of wire fraud. See 18 U.S.C. §1343.

Crundwell told other public officials that the City had to tighten its belt. She blamed a downturn in the economy and a reduction in remittances from the state, when her own theft was the real cause. Police went without valuable equipment. The City reduced the staff of its Street Department from nine to six and cut the rate of maintenance. In the decade before Crundwell's arrest, the City resurfaced only 65 blocks of its more than 100 miles of paved roads. The list of ways in which Crundwell's crime injured the population of Dixon is long and played a major role in the district court's decision to sentence her to 235 months' imprisonment, substantially above the Guideline range of 151 to 188 months.

The scheme was not particularly sophisticated. Crundwell opened an account at a local branch of Fifth Third Bank. The account was called "RSCDA Reserve Fund" and nominally was owned by the City, but Crundwell held sole control over disbursements. She used her authority as Comptroller to move money from the City's legitimate accounts to the RSCDA account. Once the money was there she wrote checks for her own benefit. She created bogus invoices to justify the transfers from the legitimate accounts.

For more than 20 years, the bank failed to notice that the funds in the RSCDA account were being put to private rather than public use. And the City's auditors—CliftonLarsonAllen and Samuel Card, a local accountant—

failed to detect the scam, even though the spot checks of invoices and disbursements required by auditing standards ought to have turned it up long before 2012. The embezzlement was caught when a bank statement of the RSCDA account reached the Mayor by accident, and he phoned the FBI because the transactions it revealed startled him. The City sued the bank and the two auditors, which recently settled for approximately $40 million. Sales of Crundwell's assets realized another $10 million, so the City has recovered much of what Crundwell took (if we disregard interest, which over this lengthy period would have been substantial) but lost the benefits, such as well-paved roads and efficient police, that the money could have achieved had it been available between 1990 and 2012.

Crundwell asked the judge to impose a sentence at the low end of the Guideline range, contending that a higher sentence could hold her well into her 70s (she was born in 1953). She contended that she had provided extraordinary assistance to the prosecution by describing all details of her scheme and helping agents marshal her assets, so that they could be sold for the City's benefit. The prosecutor, by contrast, depicted Crundwell as being no more candid than she thought necessary and less candid than she should have been. She initially asserted that the embezzlement began in 1999 or 2000, a decade after it actually started, and that the total take was approximately $10 million. She admitted the earlier start, and the higher total, only when confronted by evidence. She did not bother to tell her debriefers that she began stealing from the City in 1988, using a method different from the RSCDA account, until federal agents discovered that additional crime on their own.

The district judge recognized that Crundwell had provided some aid, principally in rounding up assets, but he thought that the value of the assistance paled in comparison with the injury that Crundwell had inflicted on the citizenry. The judge noted that her thefts deprived the citizens of the services for which their taxes had paid, and the discovery that her long-running scheme had gone on under the noses of mayors, members of the local legislature, auditors, and banks alike led to a slump in the citizens' estimate of the government's competence and value. The loss of public benefits and confidence justify a penalty above the Guideline range, the judge concluded. The judge also noted that a 235-month sentence would allow Crundwell to be released in 2030, when she would be 77, well under the life expectancy of a 60-year-old woman.

In explaining why he chose a sentence above the Guideline range, the judge relied in part on U.S.S.G. §2B1.1 Application Note 19(A)(ii), which says that a sentence may depart from the range recommended by the Sentencing Commission for financial crimes when "[t]he offense caused or risked substantial non-monetary harm. For example, the offense caused physical harm, psychological harm, or severe emotional trauma". (This language is part of Application Note 20(A)(ii) in the current version of the Guidelines; its substance is unchanged.) The judge thought that citizens of Dixon suffered "psychological harm" from the revelation that a prominent officeholder was crooked, that other officials did not detect the crime, and that for 20 years they had been deprived of valuable municipal services. Crundwell contends that only the City counts as a victim and that organizations cannot suffer psychological harm because they are insensate. Yet §2B1.1 Application Note 19(A)(ii) does not

specify the crime's immediate victim only; the language asks whether the crime caused physical or psychological harm to *anyone*. We stated in *United States v. Pabey*, 664 F.3d 1084, 1098–99 (7th Cir. 2011), that a loss of public confidence in government caused by a public official's defalcation is "psychological harm" for the purpose of this text.

What's more, a sentence's propriety does not depend on whether the Sentencing Commission has authorized a departure from the Guidelines—and departure is what §2B1.1 Application Note 19(A)(ii) is about. *United States v. Booker*, 543 U.S. 220 (2005), made departures obsolete. That's why we held in *United States v. Townsend*, 724 F.3d 749, 751 (7th Cir. 2013), that it no longer matters whether a sentencing judge properly understands the Commission's prescriptions about when departures are justified. Once a judge correctly calculates the applicable range—and Crundwell does not contest the calculation of her range—everything depends on the judge's reasonable application of the criteria in 18 U.S.C. §3553(a). Judges are entitled to implement their own penal philosophies; they are not bound by the Sentencing Commission's. See *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010) (en banc).

Crundwell contends that *Townsend* is distinguishable because it involved the denial of a defendant's request for a downward variance, while her case entails the grant of the prosecutor's request for an upward variance. That's a difference, to be sure, but it is an irrelevant difference. *Townsend* reflects the fact that *Booker* supersedes departures. Judges are entitled to discretion whether the variance is above or below

the Guideline range; the terms on which departures used to be authorized do not matter in either direction.

*Townsend* observes that a judge could misuse or misunderstand the remnants of the old departure system in three ways: a judge might suppose that a variance is forbidden unless authorized by the Sentencing Commission in a policy statement or application note (that would be an error under *Booker* and later opinions); a judge might refuse to entertain an argument based on a policy statement or note (that would be an error because many of the criteria formerly used to justify departures remain salient under §3553(a)); or a judge might believe that the policy statements and notes in the Guidelines Manual exhaust the appropriate grounds for a variance (that would be an error because §3553(a), not the Guidelines Manual, supplies the legally controlling criteria). Crundwell does not contend that the judge made any of these mistakes. The most one can say for her position is that the judge may have understood "psychological harm" differently from the Sentencing Commission—but as any difference on that score does not affect the validity of her sentence, the possibility gets her nowhere.

The district judge pronounced a substantively reasonable sentence after giving Crundwell full opportunity to present evidence and arguments. The judge thought a substantial penalty justified by considerations of deterrence and desert. Crundwell single-handedly stole from the citizens of a small community (Dixon's population is under 16,000) ten times as much as public officials in the Teapot Dome Affair, the national government's most notorious financial scandal, misappropriated from the citizenry of the country as a whole. (Secretary of the Interior Albert Fall received about $400,000,

worth $5.3 million in current dollars.) Crundwell maintains that the judge did not consider her arguments, but the judge addressed every one of them. That he thought less well of her cooperation than Crundwell herself did, and gave a lower weight to her age than she asked him to, does not undermine the sentence's validity. Judges must consider a defendant's principal arguments but need not agree with them.

AFFIRMED